**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

UNITED STATES OF AMERICA,

        *Plaintiff,*

v.

        Case No. 23-10004-01-EFM

STERLING L.T. COUSAR,

        *Defendant.*

**MEMORANDUM AND ORDER**

Before the Court are Defendant Sterling L.T. Cousar's Motions to Dismiss. He asks this Court to dismiss all 4 counts of the superseding indictment on Commerce Clause grounds and Second Amendment grounds. He also argues that this Court should dismiss counts 1, 2, and 3 based on Vagueness Due Process grounds. Lastly, he contends that this Court should dismiss counts 1, 2, and 3 for failure to state an offense. For the reasons set forth below, the Court denies all of Cousar's motions.

## I.      Factual and Procedural Background[1]

On March 23, 2022, police found Cousar—an American citizen—carrying 100 counterfeit Percocet tablets, a tobacco vape pen, and a firearm. Because he was a juvenile at the time, Cousar was never charged for this incident.

On August 22, 2022, policed stopped Cousar while he was driving and asked him to exit the vehicle. Cousar was seated on a firearm, which police discovered and recovered when Cousar

---

[1] The facts in this section were alleged by the Government during oral argument.

exited the vehicle. Police indicated that Cousar smelled like marijuana, but they found none on his person or in the vehicle. When police asked Cousar if he owned the firearm, Cousar indicated that he did not own the gun but found it lying in a yard and picked it up.

On October 21, 2022, Cousar was stopped by Wichita Police Department ("WPD"). This time, Cousar was a passenger in the vehicle. WPD officers were aware that Cousar had been found with firearms on two previous occasions, so they asked him to step out of the vehicle and asked him if he had any weapons on him. He told the officers that he did have two weapons on his person, and the officers promptly removed and seized the weapons. Then, Cousar fled from the officers and a chase ensued. The officers caught up to Cousar and apprehended him. The officers found marijuana, oxycodone, and rolled tobacco cigars on Cousar's person.

On January 24, 2023, the Government indicted Cousar for possessing a firearm as an unlawful user of a controlled substance in violation of 18 U.S.C. § 922(g)(3), and illegal possession of a machinegun in violation of 18 U.S.C. § 922(o). An arrest warrant was executed on February 3, 2023, and Cousar was released on bond.

On June 13, 2023, the Government filed a superseding indictment, charging Cousar with three counts of violating § 922(g)(3) and one count of violating § 922(o). On August 25, 2023, Cousar filed a Motion to Dismiss all 4 counts of the superseding indictment on Commerce Clause grounds (Docs. 32, 33) and Second Amendment grounds (Docs. 35, 36). He filed a separate Motion to Dismiss counts 1, 2, and 3 based on Vagueness Due Process grounds (Doc. 38). Lastly, he filed a Motion to Dismiss counts 1, 2, and 3 for failure to state an offense (Doc. 37). The Government responded to each of these motions between October 11–18, 2023. Cousar replied to the Government's responses on December 15, 2023.

On January 11, 2024, the Court scheduled a hearing for the parties to present oral arguments. This hearing occurred on February 22, 2024. The Court has fully considered both parties arguments, and each motion is now ripe for ruling.

## II.    Legal Standard

Under Federal Rule of Criminal Procedure 12(b)(3), a defendant may "raise[] by pretrial motion any defense . . . that the court can determine without a trial on the merits," including "failure to state an offense."[2] "An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense."[3]

Nonetheless, the United States Court of Appeals for the Tenth Circuit has recognized that courts "may always ask 'whether the allegations in the indictment, if true, are sufficient to establish a violation of the charged offence' and dismiss the indictment if its allegations fail that standard."[4] As such, "the strength or weakness of the Government's case, or the sufficiency of the Government's evidence to support a charge, may not be challenged by a pretrial motion."[5] Instead, the indictment is tested "solely on the basis of the allegations made on its face, and such allegations are to be taken as true."[6]

When the defendant asserts that a statute is unconstitutional on its face, and not merely as applied to him, resolving the motion "doesn't require a trial because it focuses solely on the facts

---

[2] Fed. R. Crim. P. 12(b)(1), 12(b)(3)(B)(v).

[3] *United States v. Welch*, 327 F.3d 1081, 1090 (10th Cir. 2003).

[4] *United States v. Pope*, 613 F.3d 1255, 1260 (10th Cir. 2010) (citing *United States v. Todd*, 446 F.3d 1062, 1068 (10th Cir. 2006)).

[5] *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994).

[6] *United States v. Qayyum*, 451 F.3d 1214, 1218 (10th Cir. 2006) (quoting *United States v. Reitmeyer*, 356 F.3d 1313, 1316 (10th Cir. 2004)).

alleged in the indictment and their legal adequacy."[7] Thus, the Court "may entertain motions that require it to answer only pure questions of law."[8]

### III.    Analysis

#### A.    Commerce Clause Challenges

Cousar contends that Congress exceeded its Commerce Clause powers when it enacted 18 U.S.C. § 922(g)(3) and § 922(o) because prohibiting an unlawful user from possessing "any firearm that so much as crossed state lines 'at some point in its existence'" is unconstitutional.

The Commerce Clause provides, "The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes[.]"[9] In *Scarborough v. United States*,[10] the Supreme Court held that so long the firearms had been, at some time, in interstate commerce, Congress did not exceed its power under the Commerce Clause. The constitutional understanding implicit in *Scarborough*—that Congress may regulate any firearm that has ever traversed state lines—has been repeatedly affirmed by the Tenth Circuit.[11] Consequently, the Tenth Circuit has repeatedly rejected commerce clause challenges to 18 U.S.C. § 922(g). Specifically, in *United States v. Bolton*,[12] the Tenth Circuit clearly announced that the jurisdictional hook in § 922(g) was enough to ensure constitutionality.[13]

---

[7] *Pope*, 613 F.3d at 1260 (citing *United States v. Sampson*, 371 U.S. 75, 78–80 (1962)).

[8] *Id.*

[9] U.S. Const. art. I, § 8, cl. 3.

[10] 431 U.S. 563, 575 (1977).

[11] *See, e.g.*, *United States v. Patton*, 451 F.3d 615 (10th Cir. 2016); *United States v. Campbell*, 603 F.3d 1218, 2020 n.1 (10th Cir. 2010); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009); *United States v. Urbano*, 563 F.3d 1150, 1154 (10th Cir. 2009); *United States v. Dorris*, 236 F.3d 582, 286 (10th Cir. 2000); *United States v. Farnsworth*, 92 F.3d 1001, 1006 (10th Cir. 1996).

[12] 68 F.3d 396 (10th Cir. 1995),

[13] *Id.* at 400 ("Section 922(g)'s requirement that the firearm have been, at some time, in interstate commerce is sufficient to establish its constitutionality under the Commerce Clause.")

Section 922(o) bars most transactions involving post-1986 machineguns by proscribing certain transfers and possessions. "[A]lthough not explicitly stated in the language of the statute itself, it is evident that Congress prohibited the transfer and possession of most post-1986 machineguns not merely to ban these firearms, but rather, to control their interstate movement by proscribing transfer or possession."[14] Thus, § 922(o) embodies a proper exercise of Congress' power to regulate "things in interstate commerce"—i.e., machineguns.[15] Accordingly, the Tenth Circuit explicitly held that "922(o) represents a permissible exercise of the authority granted to Congress under the Commerce Clause."[16]

Because Cousar fails to suggest any valid reason to question the aforementioned binding authority, this Court concludes that Congress constitutionally enacted both § 922(g)(3) and § 922(o) under the Commerce Clause.

## B.    Vagueness Challenge

Section 922(g)(3) prohibits any person "who is an unlawful user of or addicted to any controlled substance" from possessing a firearm. Cousar argues that § 922(g)(3) is unconstitutionally vague, in violation of the Fifth Amendment's Due Process clause, both on its face and as applied to him. He bases his challenge on that claim that the term "unlawful user" is not defined by the statute, covers an indiscernible class of individuals, and gives no temporal guidance as to when the gun possession becomes prohibited.

---

[14] *United States v. Wilks*, 58 F.3d 1518, 1522 (10th Cir. 1995) (quoting *United States v. Hunter*, 843 F. Supp. 235, 248–49 (E.D. Mich. 1994)).

[15] *Id.* at 1521 (citing *United States v. Lopez*, 115 S. Ct. 1624, 1629–30 (1995)).

[16] *Id.* at 1522.

Before the Supreme Court's decision in *Johnson v. United States*,[17] the Tenth Circuit analyzed vagueness challenges using the rules set forth in *United States v. Reed*.[18] According to *Reed*, only statutes implicating the First Amendment could be challenged facially.[19] Otherwise, a statute that implicates other constitutional rights may only be challenged as applied to the particular conduct charged.[20] The only exception to this general rule was for "those rare instances where a legislature has enacted a statute which is so totally vague as to 'proscribe no comprehensible course of conduct at all.'"[21]

Cousar argues that *Johnson* invalidated *Reed* and opened the door to facial vagueness challenges outside of the First Amendment context, even if a statute is not vague in all of its applications. Just a few months after *Johnson*'s publication, this Court considered whether it should extend *Johnson* beyond the context of the specific statute considered by the Supreme Court.[22]

In *United States v. Phommaseng*, this Court declined to apply *Johnson*'s approach "in construing § 922(g)."[23] Two years later, this Court reconsidered extending *Johnson* specifically to § 922(g)(3) but declined to do so.[24] Three years later, this Court "again decline[d] to extend *Johnson*" to another defendant's § 922(g)(3) challenge.[25] As such, this Court maintains the well-

---

[17] 576 U.S. 591 (2015).

[18] 114 F.3d 1067 (10th Cir. 1997).

[19] *United States v. Reed*, 114 F.3d 1067, 1070 (10th Cir. 1997).

[20] *Id.*

[21] *Id.* at 1070 n.1 (quoting *United States v. Powell*, 423 U.S. 87, 92 (1975)).

[22] *United States v. Phommaseng*, 2015 U.S. Dist. LEXIS 139114, at *39–40 (D. Kan. Oct. 12, 2015).

[23] *Id.* at *40.

[24] *United States v. Bell*, 2017 U.S. Dist. LEXIS 62616, at *13 (D. Kan. Apr. 25, 2017).

[25] *United States v. Crow*, 2020 U.S. Dist. LEXIS 133293, at *7 (D. Kan. July 27, 2020).

established rule that "[t]o present a successful pre-trial facial challenge, [the defendant] first must show the statute is vague as applied to his conduct."[26]

Ultimately, Cousar fails to demonstrate how § 922(g)(3) is vague as applied to his conduct. Although Cousar criticizes the statute's "unlawful user" language for being unconstitutionally vague, the Tenth Circuit has "narrow[ed] the meaning of 'user' and eliminate[d] the risk that § 922(g)(3) could be vague in its application"[27] by "interpret[ing] § 922(g)(3) so a defendant may be convicted thereunder only if the Government 'introduced sufficient evidence of a temporal nexus between the drug use and firearm possession.'"[28]

Here, the Government alleges that Cousar possessed a firearm at the same time he either smelled of illegal substances or carried illegal substances on his person. Thus, the Court concludes that these allegations—that Cousar possessed a firearm while unlawfully using illegal substances—meets the temporal nexus requirement necessary to support the alleged offense. As such, the Court holds that § 922(g)(3) is neither facially not applicably vague.

## C.    Section 922(g)(3) *Bruen* Challenge

Cousar moves to dismiss Counts 1, 2, and 3 of the Superseding Indictment, arguing that 18 U.S.C. § 922(g)(3) violates the Second Amendment after the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*.[29] Here, Cousar does not challenge the constitutionality of the statute in its entirety. Rather, he alleges that only parts of the statute— specifically, criminalizing an *unlawful user* for *possessing* a *firearm*—violate the Second Amendment.

---

[26] *Id.* at *8.

[27] *United States v. Morales-Lopez*, 92 F.4th 936, 945 (10th Cir. 2024).

[28] *Id.* (quoting *United States v. Edwards*, 540 F.3d 1156, 1163 (10th Cir. 2008)).

[29] 597 U.S. 1 (2022).

Before *Bruen*, the United States Courts of Appeals had "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny."[30] The Tenth Circuit was among those Courts of Appeals that employed a means-ends framework.[31] However, *Bruen* rejected that framework, holding instead that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."[32] That presumption can be overcome only when the Government successfully "demonstrate[s] that the regulation is consistent with this Nation's historical tradition of firearm regulation."[33] In other words, a court may uphold a regulation only when the Government "affirmatively prove[s] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[34]

Thus, to determine whether § 922(g)(3) remains viable post-*Bruen*, the Court must first assess whether the Second Amendment's plain text covers Cousar's alleged conduct. Then, the Court must determine whether the presumptive constitutional protection of Cousar's alleged conduct can be overcome by the Government's showing that § 922(g)(3) is consistent with the United States' historical tradition of firearm regulation.

1.   *Plain Text*

At step one of the *Bruen* framework, the Court must consider whether Cousar can claim protection under the Second Amendment. To do so, the Court must apply the "plain text" of the Second Amendment to the individual's "proposed course of conduct."[35] If the Second

---

[30] *Id.* at 17.

[31] *See, e.g.*, *United States v. Reese*, 627 F.3d 792 (10th Cir. 2010).

[32] 597 U.S. at 24.

[33] *Id.*

[34] *Id.* at 19.

[35] *Id.* at 32.

Amendment's text protects the individual's conduct, the Government may then rebut that presumption with history and tradition.

The Second Amendment reads, "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Thus, a textual analysis begs the question: who are "the people" entitled to Second Amendment protection?

The Government contends that the Second Amendment only protects "law-abiding, responsible citizens," and that Cousar does not fall within this group because he is an unlawful user of a controlled substance. Cousar responds that the Second Amendment protects all "members of the political community." This Court agrees with Cousar.

The Supreme Court has held that "'the people' . . . unambiguously refers to all members of the political community, not an unspecified subset." It has further explained that "the people" refers to "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."[36] The Court thus concluded that there is a "strong presumption" that the Second Amendment right to keep and carry handguns "belongs to all Americans."[37]

Additionally, there is no reason to think that "the people, as used in the Second Amendment, bears a different definition than "the people" as used in other constitutional provisions. Eight constitutional provisions refer to "the people:" the preamble, Article I § 2, and the First, Second, Fourth, Ninth, Tenth, and Seventeenth Amendments. Thus, if "the people"

---

[36] *Heller*, 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)).

[37] *Id.* at 581; *Bruen*, 597 U.S. at 70 ("The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." (quoting *Heller*, 554 U.S. at 581)).

includes only law-abiding citizens, then those who violate the law could plausibly lose the right not only to possess firearms, but to all other rights enshrined in much of the Constitution.

Cousar is an American citizen who has resided in the United States his entire life. Therefore, under Supreme Court precedent, Cousar would be a part of the "national community," and thus a part of "the people" to whom the Second Amendment guarantees the right to keep arms. Arguing that drug users are lawbreakers, and lawbreakers are not part of "the people" whose rights are protected by the Constitution is precisely the sort of carveout from "all Americans" that the Supreme Court has rejected.[38] As such, the Court finds that Cousar is a part of "the people" and consequently may claim individual constitutional protection under the Second Amendment.

### 2.    History & Tradition

When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.[39] To justify its regulation, the Government may not simply posit that the regulation promotes an important interest because means-end scrutiny is no longer supported in the Second Amendment context.[40] Rather, the Government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.[41] Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[42] Here, given that the Second Amendment presumptively protects Cousar's conduct, the burden shifts to the

---

[38] *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008).

[39] *Bruen*, 597 U.S. at 17.

[40] *Id.* at 23 (abolishing the intermediate and strict scrutiny interest balancing tests previously applied to Second Amendment questions).

[41] *Id.* at 24.

[42] *Id.* at 26.

Government to demonstrate that § 922(g)(3) is constitutional both facially and as applied to Cousar.

Determining the constitutionality of a statute under the Second Amendment is "fairly straightforward" when the challenged regulation addresses a "general societal problem that has persisted since the 18th century."[43] In such cases, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means,"[44] that too serves as evidence that the modern regulation is unconstitutional. But where the challenged regulation implicates "unprecedented societal concerns or dramatic technological changes," a "more nuanced approach" might be required.[45]

The parties dispute whether § 922(g)(3) implicates a persisting or a new societal problem. Cousar argues that § 922(g)(3) is a modern attempt to address a problem that has existed since the founding: firearm violence by those likely to demonstrate inhibition or lack of self-control due to mind-altering substances. As such, he contends that the Government must present a "*distinctly similar*" historical regulation.

In contrast, the Government argues that unlawful use of controlled substances was not an issue contemplated by the Founders in the 18th century because drug restrictions were not created until 1877. The Government contends that even if 18th century drug users did possess firearms, narcotics addiction was a negligible phenomenon in the 18th and 19th centuries and thus did not

---

[43] *Id.*

[44] *Id.*

[45] *Id.* at 27.

pose the same "general societal problem" as it does today. Consequently, the Government claims that it must only demonstrate a "*relevantly similar*" historical regulation.

When confronting present-day firearm regulations, courts must reason by analogy.[46] The metrics by which the analogy must be measured are "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense."[47] In doing so, "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."[48] The Court emphasizes that while legislatures do not have a "blank check" to regulate firearms, the *Bruen* framework is not intended to impose a "regulatory straightjacket" either.[49]

The Government bears the burden to find and explicate historical sources that support the constitutionality of § 922(g)(3). Out of an abundance of caution, the Court applies the more stringent "distinctly similar" standard in determining whether the Government has demonstrated the existence of an adequate historical analogue. Here, the Government's proffered analogues fall into three categories: (1) statutes disarming those adjudged dangerous or disloyal, (2) statutes disarming the mentally ill or insane, and (3) statutes disarming intoxicated individuals. Each deserves independent consideration.

a.      Racial, Religious, and Political Dissidents

In its defense of § 922(g)(3), the Government cites historical restrictions that it argues demonstrates a historical tradition permitting legislatures to disarm those whom the legislature

---

[46] *Bruen,* 597 U.S. at 28.

[47] *Id.* at 29 (emphasis added).

[48] *Id.* at 30 (emphasis in original).

[49] *Id.*

views as "dangerous," "untrustworthy," or "carr[ying] arms in a manner that spread fear or terror"—specifically, slaves, Native Americans, Catholics, and British loyalists. Since Congress could equally view drug users as posing the same societal threats, the Government argues that these historical regulations provide constitutional cover for § 922(g)(3). The Court disagrees.

The Government writes only one sentence in which it offhandedly mentions laws disarming "enslaved persons and Native Americans." Thus, the Court spend little time dispelling this comparison. In short, neither slaves nor Native Americans were understood to be a part of the "political community" of persons protected by the Second Amendment.[50] Slaves did not become a part of the political community until the post-Civil War amendments and thus did not hold any Second Amendment rights until then.[51] Likewise, Native Americans were not considered a part of the political community protected by the Second Amendment until the adoption of the Indian Citizenship Act of 1924.[52] Thus, historical restrictions on these groups provide little insight into the meaning of the Second Amendment because the ratifying public would not have understood those group to be protected by the Second Amendment.

Similarly, the Government's reliance on laws restricting the rights of Catholics and British loyalists misses the mark. As *Bruen* explained, "when it comes to interpreting the Constitution,

---

[50] *Heller*, 554 U.S. at 580. *Cf. United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) ("[W]e would also have to recognize that groups like women, Native Americans, and blacks may not have been part of the political community at the time of the founding.").

[51] *See Scott v. Sandford*, 60 U.S. (19 How.) 393, 416–17 (1857) (explaining that the Constitution did not regard African Americans "as included in the word citizens" because doing so would "give to persons of the negro race . . . the full liberty . . . to keep and carry arms wherever they went."); *see also See McDonald v. City of Chicago*, 561 U.S. 742, 822–23, 844–50 (2010) (Thomas, J., concurring in part & concurring in judgment); *Bruen*, 597 U.S. at 60.

[52] Indian Citizenship Act, Pub. L. No. 68-175, 43 Stat. 253 (1924) (granting "all non-citizen Indians born within the territorial limits of the United States" citizenship rights and thus bringing them within the political community protected by the Second Amendment).

not all history is created equal."[53] Although the Second Amendment and other provisions of the Bill of Rights were intended to codify pre-existing rights,[54] the Constitution and Bill of Rights did not incorporate all pre-1789 practices. In fact, the Framers prematurely recognized that colonial and early state governments repeatedly violated the liberty-protecting provisions of the English and state bills of rights.[55] The Founders certainly did not leave England and fight in the Revolutionary War to create the exact same set of laws from which they fled. Rather, the Constitution and the Bill of Rights served as a repudiation—not an incorporation—of pre-1789 practices.[56]

As to the American colonies that disarmed Catholics, this analogue falls short as well. First, the disarmament of Catholics and loyalists applied to other civil liberties as well.[57] For example, each colony—except Pennsylvania—debarred or restricted "the exercise of the Catholic religion."[58] But even in Pennsylvania, colonists "were civilly restricted by oaths required from officers which a Catholic could not take had any been chosen to office."[59] However, after the ratification of the Bill of Rights, the First Amendment nullified these laws.

Certainty, nobody would cite these pre-ratification violative religious liberty laws as support for stripping people of their religious freedom today. But the Government applies that

---

[53] *Bruen*, 597 U.S. at 34.

[54] *Heller*, 554 U.S. at 592 ("[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right." (emphasis in original)).

[55] *See Cooper v. Telfair*, 4 U.S. (4 Dall.) 14, 19 (1800) (explaining that since the Bill of Rights' adoption, "[f]ew of the revolutionary acts would stand the rigorous test now applied" under the federal Constitution).

[56] *See United States v. Harrison*, 654 F. Supp. 3d 1191, 1217–18 (W.D. Okla. 2023) (explaining how the Fourth Amendment both codified a pre-existing right and rejected the colonial-era practices of writs of assistance and general warrants).

[57] *Id.* at 1219.

[58] Martin I. J. Griffin, *The Anti-Catholic Spirit of The Revolution*, 6 Am. Cath. Hist. Rschs., 146, 147 (1889).

[59] *Id.*

same logic in the Second Amendment context. The 1759 Pennsylvania Catholic disarming statute, 1756 Maryland Catholic disarming statute, and the 1756 Virginia Catholic disarming statute all operated under the English Bill of Rights, which limited the right "to have arms" to Protestants.[60] Thus, Catholics were excluded from the protections of the Right. But, after the American Bill of Rights' ratification in 1791, these laws were incompatible with the Constitution.

But, assuming arguendo that pre-1789 laws justify an exception to the Second Amendment based on a legislature's decision that a group of people is "untrustworthy," the laws must also justify similar exceptions to other basic rights—including the First, Fourth, and Fifth Amendment rights.[61] The Court refuses to do so. As such, this Court finds that laws applying to a group of people devoid of Second Amendment protection does not provide any insight into that right's scope.

Lastly, the colonial laws targeting Catholics and loyalists cannot possibly serve as constitutionally relevant analogues to § 922(g)(3) because the justifications for these laws—that is, the "why" under *Bruen*—are dissimilar. Those colonial laws were justified on the fear that the covered groups were likely to wage active war against the colonies or interfere with the colonists' war efforts.[62] This is a radically different justification than that of § 922(g)(3).

As such, the Court is unpersuaded that laws disarming certain racial, religious, or political outcasts enacted before the Second Amendment's ratification serve as distinctly similar historical analogues comparable to § 922(g)(3)'s justification and burden.

---

[60] *See Heller*, 554 U.S. at 592–93.

[61] *Harrison*, 654 F. Supp. 3d at 1219.

[62] *See Folajtar v. Att'y Gen.*, 980 F.3d 897, 914 (3d Cir. 2020) (Bibas, J., dissenting).

b.      The Mentally Ill

Next, the Government argues that drug abusers and the mentally ill have long been analogized due to a common a historical basis. To support this proposition, the Government points to pre-colonial and colonial practices that severely curbed the liberty of "idiots and lunatics," particularly the ability to "lock up 'dangerous lunatics' and seize their property." However, the Government also contends that dangerousness is not necessary for imprisonment and seizure of property. Instead, the Government argues, so long as the mentally ill—or any "limited, narrowly tailored specific group" for that matter—exhibits "irresponsibility," it is permissible to disarm such persons.

The Court is not convinced of this historical analogue. Obviously, mental illness and drug use are not the same thing. They are similar in the sense that those who are "briefly mentally infirm as a result of intoxication" are like those "permanently mentally infirm" because of illness or disability.[63] But that is where the similarities end.

There is not a clear set of positive-law statutes concerning mental illness and firearms. In fact, the federal ban on gun possession by those judged mentally ill was enacted in 1968, the same year as § 922(g)(3).[64] But scholars have suggested that the tradition was implicit at the founding because, "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.'"[65] In other words, if the insane could be wholly deprived of their liberty and property, the government could necessarily take away their firearms.

---

[63] *United States v. Daniels*, 77 F.4th 337, 349 (5th Cir. 2023).

[64] *See* 18 U.S.C. § 922(g)(4); *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010).

[65] *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010) (per curiam) (quoting Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009)).

The Founders purportedly institutionalized the insane and stripped them of their guns. But insanity, unlike drug usage, was a perpetual state of being. In the 18th century, one could not "sober up" from lunacy like one could with consumptive mind-altering substances. Thus, just as there was no historical justification for disarming a citizen of sound mind, there is no tradition that supports disarming a sober citizen who is not currently under an impairing influence.

Moreover, the Court finds the Government's "why" and "how" explanations tenuous at best. Specifically, it is worrisome that the Government strayed from its original disarmament justification of "dangerousness" to the much more amorphous justification of "irresponsibility." The legislature could classify almost anything or anyone as "dangerous," let alone "irresponsible." The Court need not look any further than the Government's citations to laws disarming Native Americans, Catholics, slaves, and loyalists to reach this conclusion. Does speeding—even recklessly—make one "dangerous?" Surely it makes one irresponsible. But does that justify disarmament—at least while driving? If all a legislature must do to prohibit arms possession is to label a group of people "dangerous," "irresponsible," or "untrustworthy," then the Second Amendment would provide virtually no limit on Congress's discretion.[66] Certainly, the Framers did not intend such a practice.

As such, the Government must do more to meet its burden than merely connect a historical example to the challenged statute by nothing more than a linguistically ambiguous adjective. Doing so would guarantee legislatures the very blank check forbidden by the Supreme Court. Thus, more specificity and connectivity are necessary to convince this Court that *Bruen*'s "why" requirement—i.e., the justification behind disarming the mentally ill and a drug user—is met.

---

[66] *See Daniels*, 77 F.4th at 353 ("[The legislature cannot have unchecked power to designate a group of persons as "dangerous" and thereby disarm them. Congress could claim that immigrants, the indigent, or the politically unpopular were presumptively "dangerous" and eliminate their Second Amendment rights without judicial review.").

As to *Bruen*'s "how," the Court cautions the Government against justifying a firearm restriction based on limiting its effects to a "narrowly tailored specific group." *Bruen* made clear that courts may not engage in "independent means-end scrutiny under the guise of an analogical inquiry" because "the Second Amendment is the 'product of an interest balancing by the people,' not the evolving product of federal judges."[67] The Court reiterated, "[analogical reasoning] is not an invitation to revise that balance through means-end scrutiny."[68]

In sum, the Court is unpersuaded that laws disarming the mentally ill serve as distinctly similar historical analogues comparable to § 922(g)(3)'s justification and burden.

#### c.   Alcohol Users

Because there was little regulation of drugs until the late-19th century, intoxication via alcohol is the next-closest comparator. Common sense indicates that individuals who are impaired by alcohol lack the self-restraint to handle deadly weapons safely. So, it is unsurprising to find historical laws dealing with guns and alcohol. Such rules are relevant to our history and tradition of gun regulation. The Court finds that the Government has met its burden of demonstrating that § 922(g)(3) "is consistent with the Nation's historical tradition of firearm regulation"[69] by successfully identifying distinctly similar restrictions at the founding era.

Consequently, Cousar's argument that the historical record demonstrates no "well-established and representative historical analogue"[70] to § 922(g)(3) fails. The Court finds that the burden Cousar attempts to impose upon the Government would require it to identify a "historical twin," thereby imposing a "regulatory straightjacket" on Congress that vastly exceeds what the

---

[67] *Bruen* 597 U.S. 1, 29 n.7 (quoting *Heller*, 554 U.S. at 635)

[68] *Id.*

[69] *Id.* at 24.

[70] *Id.* at 30.

Supreme Court intended.[71] Demanding any more specificity would arguably prevent the government from restricting any illegal drug users from possessing guns.

Instead, the Court finds it sufficient for the Government to identify a common thread—comparing the new law to the old—of legislatively disarming individuals who, due to mind-altering substances, are likely to act more dangerously when possessing and/or using firearms. It is difficult to imagine that a colonial legislature would have seen much difference between the hazard presented by an armed alcoholic and an armed habitual user of illegal drugs. As such, it is equally difficult to conceive that application of the *Bruen* formulation requires that sort of a differentiation.

Numerous founding-era state legislatures had entrenched regulations "restric[ing] the right of habitual drug users or alcoholics to possess or carry firearms."[72] For example, Virginia imposed punishment—forfeiture of 100 pounds of tobacco, among other penalties—on "[w]hat persons soever [who] shall . . . shoot any gunns at drinkeing (marriages and funeralls only excepted)."[73] Similarly, the New York legislature recognized that "great Damages are frequently done on the Eve of the last Day of December, and on the first and second days of January by Persons going from House to House with Guns and other Fire Arms, and often being intoxicated with Liquor."[74] Likewise, a 1731 Rhode Island law forbade firing guns or pistols in any tavern at night.[75]

---

[71] *Id.*

[72] *Yancey*, 621 F.3d at 684.

[73] 1655 Va. Acts 401, Acts of March 10, 1655, Act XII, in 1 Hening, *The Statutes at Large: Being a Collection of all the Laws of Virginia*, 401-02 (1823).

[74] N.Y. Col. Laws, vol. v, pp. 532-33 March 8, 1773, as quoted in Arthur Everett Peterson and George William Edwards, *New York as an Eighteenth Century Municipality, Part II*, p. 127 (New York: Longmans, Green & Co., 1917).

[75] *See* Acts & Laws of the English Colony of Rhode-Island & Providence-Plantations 120 (Hall, 1767).

During the reconstruction era, restrictions on firearm use while intoxicated continued—and perhaps even increased—following the ratification of the Fourteenth Amendment in 1868 and the attendant extension of the Second Amendment to the states.[76] By the turn of the century, intoxicants other than alcohol became more prevalent, as did regulation of those intoxicants.[77] By the early 1930s, several jurisdictions barred the sale of firearms to "drug addict[s]."[78]

Today, at least half of the jurisdictions around the country restrict habitual drug users and alcoholics from possessing or carrying firearms.[79] These restrictions, along with those from the founding and reconstruction eras, demonstrate that Congress was not alone in concluding that habitual drug abusers are unfit to possess firearms. The state prohibitions are merely "the latest incarnation of the states' unbroken history of regulating the possession and use of firearms dating back to the time of the amendment's ratification."[80] That some of these restrictions are "entrenched" supports their constitutionality because "contemporaneous legislative exposition of the Constitution, when the founders of our government and framers of our Constitution were actively participating in public affairs . . . fixes the construction to be given its provisions."[81]

---

[76] *See McDonald*, 561 U.S. at 791 (2010).

[77] *United States v. Okello*, 2023 U.S. Dist. LEXIS 152238, at *10–11 (D. S.D. Aug. 25, 2023) (collecting sources).

[78] Act of Apr. 6, 1936, No. 82, §1936 Ala. Laws 52; Act of July 8, 1932, ch. 465, § 7, 47 Stat. 650, 652 (D.C.); Uniform Firearms Act, No. 158, § 8, 1931 Pa. Laws 499; 1935 S.D. Sess. Laws ch. 208, § 8, 356; Short Firearms, ch. 172, § 8, 1935 Wash. Sess. Laws 601.

[79] *See* Ala. Code § 13a-11-72(B); Ark. Code Ann. § 5-73-309(7), (8); Cal. Penal Code § 29800(a)(1); Colo. Rev. Stat. § 18-12-203(1)(e), (f); Del. Code Ann. tit. 11, § 1448(a)(3) (effective June 30, 2025); D.C. Code § 22-4503(a)(4); Fla. Stat. § 790.06(2)(e)(2), (f); Fla. Stat. § 790.151(3); Ga. Code Ann. § 16-11-129(b)(2)(I), (J); Haw. Rev. Stat. § 134-7(c)(1); Idaho Code Ann. § 18-3302(11)(e); 720 Ill. Comp. Stat. 5/24-3.1(a)(3); Ind. Code § 35-47-1-7(5); Kan. Stat. Ann. § 21-6301(a)(10); Ky. Rev. Stat. Ann. § 237.110(4)(d), (e); Md. Code Ann., Pub. Safety, 5-133(b)(7), (5); Mass. Gen. Laws Ch. 140, § 129b(1)(iii)(A), (D); Minn. Stat. § 624.713(1)(10)(iii); Mo. Rev. Stat. § 571.070(1)(2); Nev. Rev. Stat. § 202.360(1)(f); N.J. Stat. Ann. § 2C:58-3(c)(3); Ohio Rev. Code Ann. § 2923.13(A)(4); R.I. Gen. Laws § 11-47-6; S.C. Code Ann. § 16-23-30(A)(1); S.D. Codified Laws § 23-7-7.1(3); W. Va. Code § 61-7-7(a)(3).

[80] *Yancey*, 621 F.3d at 684.

[81] *Myers v. United States*, 272 U.S. 52, 175 (1926).

As part of this unbroken history, "how" and "why" § 922(g)(3) burdens the Second Amendment is analogous to the statutes that came before it.[82] Like its historical predecessors, § 922(g)(3) temporarily disarms those whose judgment is impaired by mind-altering substances because unlawful habitual drug users, when impaired, "are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms."[83]

The fact that similar regulations have long existed without question to their constitutionality persuades the Court to uphold § 922(g)(3). Under the historical regulations, the intoxicated could not carry or use firearms, and under the modern regulation, active drug users cannot possess firearms. Thus, unlike the disarmament laws based on immutable characteristics such as race or mental capacity, § 922(g)(3) allows an unlawful drug user to "regain his right to possess a firearm simply by ending his drug abuse."[84] And, the plain language of the statute affirms this interpretation. Section 922(g)(3) bars only those persons who are *current* drug users from possessing firearms. Thus, dispossession is not necessarily permanent.[85] Rather, it extends only so long as the unlawful drug use continues—meaning, the user ultimately controls his right to possess a gun. Although these historical regulations may not be "dead ringer[s]," they are nonetheless sufficiently analogous.[86] As such, the historical intoxication disarmament statutes the Government presents are distinctly similar to § 922(g)(3)'s justification and burden.

---

[82] *See Bruen* 597 U.S. at 29.

[83] *Yancey*, 621 F.3d at 685.

[84] *Id.* at 686.

[85] *See United States v. Posey*, 655 F. Supp. 3d 762, 775–76 (N.D. Ind. 2023) ("The burden imposed by § 922(g)(3) only endures for as long as the individual is an unlawful user or addict, leaving them free to regain their full Second Amendment rights at any time. In contrast, the burden imposed upon convicted felons and the mentally ill is a lifelong one. Therefore, the Court finds that this, relatively lenient, burden placed on a defined group of persons is directly analogous to the burden placed on felons and the mentally ill." (internal citations omitted)).

[86] *Bruen*, 597 U.S. at 30.

The Court is not persuaded that the distinction between prohibiting gun *possession* while intoxicated and prohibiting gun *use* while intoxicated is significant under the *Bruen* framework. For example, because alcohol has generally been lawful, laws understandably allowed alcohol drinkers to *possess* firearms, limiting their *use* only during periods of intoxication. Section 922(g)(3), by contrast, merely punishes behavior already deemed illegal. For that reason, the statute is distinctly similar to founding-era regulations aimed at preventing intoxicated persons from possessing and using firearms. Thus, § 922(g)(3) is constitutional under the Second Amendment.

D.     **Section 922(o) *Bruen* Challenge**

Cousar is also charged with violating 18 U.S.C. § 922(o), which provides in relevant part: "it shall be unlawful for any person to transfer or possess a machinegun." For the purposes of the statute:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.[87]

Cousar is charged with unlawfully possessed a machine gun—a Glock 27, 0.40 caliber pistol. He now moves to dismiss Count 4 of the Superseding Indictment, arguing that § 922(o) violates the Second Amendment post-*Bruen*.

---

[87] 26 U.S.C. § 5845(b).

    *1.     Plain Text*

As was the case with Cousar's other *Bruen* challenge, the Court begins with determining whether § 922(o) outlaws conduct covered by the Second Amendment's plain text. Because the statute prohibits anyone—even "members of the political community"[88]—from possessing a machinegun, there is no debate that § 922(o) implicates the rights of "the people." Thus, the only question this Court must answer is whether the "right to keep and bear Arms" covers possessing a machinegun such as a Glock switch.

The Second Amendment's plain text does not cover the keeping and carrying of "any weapon whatsoever in any manner whatsoever and for whatever purpose."[89] Rather, the Second Amendment protects the possession and use of those "Arms" that were "in common use at the time."[90] This does not mean that the Second Amendment is limited to "only those arms in existence in the 18th century."[91] Rather, the Second Amendment extends, "prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."[92]

Before *Bruen*, the Supreme Court explained in *Heller* that a weapon is not "in common use"—and thus the Second Amendment's plain text does not cover it—if the weapon is "dangerous

---

[88] *Heller*, 554 U.S. at 580

[89] *Bruen*, 597 U.S. 1, 21.

[90] *Id.* (quoting *Heller* at 627).

[91] *Heller*, 554 U.S. at 582.

[92] *Id.*

and unusual."[93] The Courts of Appeals have uniformly found machineguns to be dangerous, unusual, and not in common use both before *Heller*[94] and after *Heller*.[95]

Cousar tries to persuade this Court to reject the "common usage" formulation. To do so, he first cites *Caetano v. Massachusetts*,[96] explaining that the Supreme Court rejected the argument that stun guns are not constitutionally protected because they were not "in common use" at the time of the Second Amendment's enactment.[97] However, the *Caetano* Court did not vacate the decision below because of any numerical disagreement. Rather, it did so because the Massachusetts Supreme Court erroneously "equat[ed] 'unusual' with 'in common use at the time

---

[93] *Id.* at 627.

[94] *See Haynes v. United States*, 390 U.S. 85, 87 (1968) (describing machine guns as "weapons used principally by persons engaged in unlawful activities"); *United States v. Lucero*, 43 F. App'x 299, 301 (10th Cir. 2002) (Lucero, J., concurring) ("I am not persuaded that the semi-automatic and fully automatic "machineguns" which defendant sold to federal agents, and which have been outlawed by federal legislation, are the type of arms subject to Second Amendment protection."), *cert. denied*, 537 U.S. 1064 (2002); *United States v. Spires*, 755 F. Supp. 890, 892 (C.D. Cal. 1991) ("Congress believed these particular weapons [machineguns], as opposed to firearms in general, are extremely dangerous and serve virtually no purpose other than furtherance of illegal activity.").

[95] *See United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) ("Machine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use."), *cert. denied*, 555 U.S. 1174 (2009); *Hamblen v. United States*, 591 F.3d 471, 472, 474 (6th Cir. 2009) ("[W]hatever the individual right to keep and bear arms might entail, it does not authorize an unlicensed individual to possess unregistered machine guns for personal use."), *cert. denied*, 559 U.S. 1115 (2010); *United States v. Marzzarella*, 614 F.3d 85, 94 (3d Cir. 2010) ("[T]he the Supreme Court has made clear the Second Amendment does not protect [machine guns].");  *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) ("We agree with the reasoning of our sister circuits that machine guns are 'dangerous and unusual weapons' that are not protected by the Second Amendment."); *United States v. Zaleski*, 489 F. App'x 474, 475 (2d Cir. 2012) ("Regardless of [plaintiff's] membership in the unorganized militia of the State of Connecticut, the Second Amendment does not protect [his] personal possession of machine guns."), *cert. denied*, 568 U.S. 990 (2012); *Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015) ("*Heller* deemed a ban on private possession of machine guns to be obviously valid."); *United States v. One (1) Palmetto State Armory PA-1 5 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804*, 822 F.3d 136, 143–44 (3d Cir. 2016) ("[T]he Second Amendment does not protect the possession of machine guns. They are not in common use for lawful purposes."); *Hollis v. Lynch*, 827 F.3d 436, 449–51 (5th Cir. 2016) ("For purposes of the present case, we conclude it does not matter which set of numbers we adopt. None of them allow a conclusion that a machinegun is a usual weapon. . . . Machineguns are dangerous and unusual and therefore not in common use.").

[96] 577 U.S. 411 (2016).

[97] *Id.* at 412.

of the Second Amendment's enactment.'"[98] The *Caetano* majority itself never delved into whether stun guns are "dangerous and unusual."[99]

Next, Cousar cites *Heller*'s dissent, which criticizes the majority's reasoning under which "if Congress and the States lift restrictions on the possession and use of machineguns, and people buy machineguns to protect their homes, the Court will have to reverse course and find that the Second Amendment does, in fact, protect the individual self-defense-related right to possess a machinegun."[100] This dissenting dictum does not support a finding that the Second Amendment's plain text covers machineguns.

The Court is not persuaded that *Bruen* has meaningfully changed the "dangerous and unusual common use" standard when it comes to interpreting the text of the Second Amendment. Today, machineguns remain dangerous and unusual. Machineguns, which have been likened to pipe bombs and hand-grenades, are within the category of weapons of "quasi-suspect character" that are inherently dangerous.[101] They are also unusual. Despite Cousar's argument that there are over 700,000 legally registered machineguns in the United States today, this amount—which is less than 0.2% of total firearms in the United States—remains too insignificant for machineguns to be considered in common use.[102]

Evidently, many district courts have upheld § 922(o)'s constitutionality post-*Bruen*[103] holding that dangerous and unusual weapons like machineguns do not fit within the plain meaning

---

[98] *Id.*

[99] *See id.* at 411–12.

[100] *Heller*, 554 U.S. at 720–21 (J. Breyer, J. Stevens, J. Souter, J. Ginsberg dissenting).

[101] *Staples v. United States*, 511 U.S. 600, 611–12 (1994).

[102] *United States v. Simien*, 65 F. Supp. 3d 540, 554 (W.D. Tex. 2023).

[103] *See id.* ("Based on this evidence, the Court finds machineguns are within the category of 'dangerous and unusual' weapons that do not receive Second Amendment protection and Simien's facial challenge to § 922(o), therefore, fails."); *United States v. Shelton*, 2023 WL 1812743, at *5 & n.2 (W.D. Pa. Feb. 8, 2023) (noting that §

that the Supreme Court has ascribed to "Arms" covered by the Second Amendment. In fact, Cousar's reading of the Second Amendment's plain text to cover machineguns is a reading that the *Heller* Court would have found "startling."[104] The fact is, machineguns are "dangerous and unusual" weapons and thus are not weapons "in common use." For that reason, this Court—following *Miller*, *Heller*, and *Bruen*—joins the vast majority of courts to hold that there is no Second Amendment right to possess a machinegun. As such, the Court holds that § 922(o) is constitutional, both facially and as-applied to Cousar.

Therefore, because Cousar has failed to demonstrate how any of the charges brought against him violate the Constitution, the Court finds that the Government has sufficiently stated an offense.

**IT IS THEREFORE ORDERED** that Cousar's Motion to Dismiss Counts 1, 2, and 3 on Commerce Clause Grounds (Doc. 32) is **DENIED.**

**IT IS FURTHER ORDERED** that Cousar's Motion to Dismiss Count 4 on Commerce Clause Grounds (Doc. 33) is **DENIED.**

**IT IS FURTHER ORDERED** that Cousar's Motion to Dismiss Counts 1, 2, and 3 on Second Amendment Grounds (Doc. 35) is **DENIED.**

---

922(o) prohibits anyone, even law-abiding individuals, from possessing a machinegun); *United States v. Dixon*, 2023 WL 2664076, at *3 (N.D. Ill Mar. 28, 2023) ("Thus, *Miller*, *Heller*, and *Bruen* foreclose any challenge to the federal machinegun ban. The Second Amendment simply does not extend to 'dangerous and unusual weapons.'"); *United States v. Kazmende*, 2023 WL 3872209, at *3 (N.D. Ga., May 17, 2023) (same); *DeWilde v. United States*, 2023 WL 4884582, at *6 (D. Wyo. July 17, 2023) (finding, after post-*Bruen* analysis, that "there is no Second Amendment right to possess a machinegun); *United States v. Lane*, 2023 WL 5663084, at *14 (E.D.V.A. Aug. 31, 2023) (holding that § 922(o) withstands *Bruen* and that dangerous and unusual weapons like machineguns do not fit within the plain meaning that the Supreme Court has ascribed to "Arms" covered by the Second Amendment); *United States v. Kittson*, 2023 WL 5015812, at *1 (D. Ore. Aug. 7, 2023) (joining the several courts who have found, post-*Bruen*, that machineguns are not protected by the Second Amendment).

[104] *Heller*, 554 U.S. 570, 624 (2008).

**IT IS FURTHER ORDERED** that Cousar's Motion to Dismiss Count 4 on Second Amendment Grounds (Doc. 36) is **DENIED.**

**IT IS FURTHER ORDERED** that Cousar's Motion to Dismiss Counts 1, 2, and 3 on Failure to State an Offense (Doc. 37) is **DENIED.**

**IT IS FURTHER ORDERED** that Cousar's Motion to Dismiss Counts 1, 2, and 3 on Vagueness Grounds (Doc. 38) is **DENIED.**

**IT IS SO ORDERED.**

Dated this 2nd day of April, 2024.


ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE